STATE of Wisconsin, Plaintiff-Respondent,

v.

Sandra K. PANKOW,† Defendant-Appellant.

Court of Appeals

No. 87–0834–CR. Submitted on briefs December 9, 1987.—
Decided March 29, 1988.

(Also reported in 422 N.W.2d 913.)

† Petition to review pending. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.

For the defendant-appellant there were briefs by *Donald T. Lang,* assistant state public defender, of Milwaukee.

For the plaintiff-respondent there was a brief by *Donald J. Hanaway,* attorney general, and *William L. Gansner,* assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Sandra Pankow appeals her convictions, two counts of second-degree murder, sec. 940.02, Stats. The events leading to criminal charges occurred during a five-year period while Pankow was engaged in baby-sitting a number of children in her home. Three infants died in separate incidents while in Pankow's care.

The deaths of Kristin Hamilton on December 29, 1980, and Shawn Bloomer on August 10, 1982, were originally diagnosed as sudden infant death syndrome (SIDS). After the third death, Tyler Kloes on October 25, 1985, Outagamie County Coroner Phil Russell arranged for an autopsy of Tyler Kloes to be conducted at University Hospitals in Madison, Wisconsin. The cause of death was initially listed as "probable SIDS." However, the university pathologists eventually arrived at a diagnosis of asphyxia.

The pathologists then reinvestigated the deaths of Kristin Hamilton and Shawn Bloomer. A review was initially conducted of microscopic tissue slides taken

from various internal organs during the original autopsies. The infants' bodies were then exhumed and transported to Madison for further study. The pathologists concluded that the deaths of Kristin Hamilton and Shawn Bloomer were also due to asphyxia.

Three counts of second-degree murder were charged against Sandra Pankow. Following a two-week jury trial, Pankow was convicted in the deaths of Kristin Hamilton and Tyler Kloes, but was acquitted with regard to the death of Shawn Bloomer.

Pankow presents five claims on review: (1) The evidence was insufficient to support the conviction, (2) the trial court erred by admitting expert testimony regarding the mathematical improbability of three occurrences of SIDS in the same household within five years, (3) the prosecution improperly failed to preserve for defense examination potentially exculpatory physical evidence, (4) the trial court improperly denied a motion for mistrial based on the admission and subsequent striking of "other acts" testimony, and (5) a new trial is required in the interest of justice. We reject these claims and affirm the conviction.

## SUFFICIENCY OF EVIDENCE

The first issue raised by Pankow is the assertion that the evidence was insufficient to prove beyond a reasonable doubt that Tyler Kloes's death was a homicide. Pankow also contends that the evidence fails to establish beyond a reasonable doubt that she caused the deaths of either Kristin Hamilton or Tyler Kloes. Pankow insists that the evidence suggests that her son, Christopher, was the individual most likely responsible for any misconduct that may have caused the deaths.

 The standard of review for assessing the sufficiency of the evidence is well established. We emphasize initially that our appellate function is not to retry the issues. *See State v. Balistreri,* 106 Wis. 2d 741, 763, 317 N.W.2d 493, 503 (1982). We will not substitute the judgment of the jury merely because certain evidence is in conflict or would support a different result. When a defendant challenges the sufficiency of the evidence, the test on review is whether the evidence is so insufficient in probative value and force that as a matter of law no reasonable jury could have found guilt beyond a reasonable doubt. *State v. Wyss,* 124 Wis. 2d 681, 693, 370 N.W.2d 745, 751 (1985). In this regard, we consider the evidence before the jury and all reasonable inferences in the light most favorable to the verdict. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

 A criminal conviction can be based in whole or in part upon circumstantial evidence. *Peters v. State,* 70 Wis. 2d 22, 33–34, 233 N.W.2d 420, 426 (1975). Circumstantial evidence is often more probative than direct evidence, and it is clear that circumstantial evidence alone may be sufficient to convict. *Wyss,* 124 Wis. 2d at 692, 370 N.W.2d at 751.

 The test for circumstantial evidence is whether it is strong enough to exclude every reasonable hypothesis of innocence. *State v. Drusch,* 139 Wis. 2d 312, 326, 407 N.W.2d 328, 334 (Ct. App. 1987). This does not mean, however, that if any of the evidence brought forth at trial suggests innocence, the jury cannot find the defendant guilty. *Peters,* 70 Wis. 2d at 34, 233 N.W.2d at 426. The function of the jury is to decide

which evidence is credible and which is not, and how conflicts in the evidence are to be resolved. The jury may thus, within the bounds of reason, reject testimony suggestive of innocence. *Id.*

We turn to a summary of the evidence in the light most favorable to the conviction. We begin with the testimony of several children whom Pankow also baby-sat.

Jeremy Olk testified that when babies cried, Sandra Pankow tied a towel around their mouths. He witnessed Sandra Pankow tie a dish towel around a baby's mouth and put the baby in a crib in the basement when the baby cried. Jeremy testified that Christopher Pankow was not in the basement at the time and that he never saw Christopher do anything to the babies.

Deanna Olk also testified that babies, including Kristin Hamilton, slept in a crib in Pankow's basement. The crib was entirely covered by a blanket held by clothespins. The blanket extended down the sides of the crib to the floor.

Lisa Hamilton testified that babies took their naps in a playpen in the basement. Lisa specifically testified that on the day Kristin died, Kristin was sleeping in the basement.

David Janssen testified to one occasion when he and Christopher Pankow went into the Pankows' basement to get a Popsicle. Christopher Pankow showed David a baby in the crib with a towel around the baby's mouth. The baby's hands were also tied. Janssen testified that a cloth sheet covered the entire top of the crib and hung down the sides. David did not see who tied up the baby.

Judith Olson testified that in early 1984, while walking up to Pankow's house to pick up her son,

Isaac, she heard someone yelling. Olson testified that when she walked in the door, Sandra Pankow was in the shower. Christopher Pankow was standing near the open bathroom door while talking to Sandra. When Christopher noticed Olson, he looked surprised and proceeded to the basement. Olson testified that she then observed her son in a playpen entirely covered by a wooden board. Olson testified that her son was confined to laying down because of the wooden covering. Christopher lifted up the wooden covering and handed Olson her son.

Sandra Pankow testified that Kristin Hamilton and Tyler Kloes were sleeping in upstairs bedrooms when she discovered they were not breathing. Christopher Pankow testified that he witnessed his mother taking a sleeping Tyler Kloes to his bedroom, that he then went outside, and the next time he saw Tyler he was dead in Sandra's arms. Christopher also testified that Kristin Hamilton was sleeping in his parents' bedroom at the time of her death. Christopher later testified, however, that he did not see Kristin in his parents' bedroom, and that he could not recall where he saw Kristin.

Christopher Pankow testified as a defense witness that he tied up babies and covered their mouths. On cross-examination, however, the prosecutor showed Christopher his preliminary hearing testimony. He was asked whether he had anything to do with the three deaths. Christopher Pankow answered, "No." Christopher later admitted that he was not even home the day Shawn Bloomer died.

Christopher Pankow testified that at no time were babies put in the basement to sleep. Paula Jannusch, a neighbor of the Pankows, testified that on the day Tyler Kloes died, Christopher Pankow told her

shortly after the ambulance left that the baby was sleeping downstairs. Approximately one-half hour later, Christopher came back and told her that the baby was asleep upstairs in a crib in Sandra Pankow's bedroom.

A tape recording of an emergency "911" telephone call made October 25, 1985, the date of Tyler Kloes's death, in Christopher Pankow's voice, was produced at trial. When the dispatcher asked what happened, the voice responded, "He wasn't choking on anything. He was just downstairs sleeping."

Numerous medical experts also testified. Pathologist Andrew Dodge conducted the autopsy on Tyler Kloes at University Hospitals on October 26, 1985. Dr. Dodge found petechia on the surface of the lungs and thymus larger than in prior SIDS cases he had seen. Dr. Dodge also noted significant cerebral edema, a heavy wet brain, as well as congestion of the vessels in the brain, findings not usually present in SIDS cases. Based on these findings, Dr. Dodge concluded that Tyler Kloes's death was most likely the result of asphyxia.

Pathologist Robert Huntington testified that the petechia on the lungs and thymus were larger than those usually seen in SIDS cases. The swollen and wet brain was also not usual in SIDS. Another suspicious circumstance was the atypically brief period between the child being placed in the crib and being discovered. Dr. Huntington indicated in his opinion there was a 95–97% probability that the death of Tyler Kloes was caused by homicidal asphyxiation.

In the case of Kristin Hamilton, Dr. Huntington studied the original autopsy slides and the exhumed body. He testified that both microscopic review of the slides and gross examination of the exhumed lungs

revealed petechia larger than in the normal SIDS case. According to Dr. Huntington, the slides also reflected hemorrhaging in tissues of the neck to a degree not expected in SIDS.

On gross examination of the exhumed body, the doctor noted hemorrhaging on the upper and lower gum line around the incisors. He had not seen this type of hemorrhaging in SIDS cases or as a result of CPR. If tight enough, a towel tied around the mouth could explain this hemorrhaging. He also observed hemorrhaging around the retina of the eyes, a finding not usual in SIDS cases. Dr. Huntington testified that this hemorrhaging would not be evident to a pathologist initially conducting an autopsy with the eyes remaining in place.

Based on the size of the petechia in the lungs, the hemorrhaging on the gums and retina, the age of the child, and the absence of any indication of accident, Dr. Huntington was certain that Kristin Hamilton died of asphyxia. According to the doctor, there was less than a 1% chance he was wrong that Kristin was asphyxiated.

In the opinion of Dr. Enid Gilbert, Professor of Pathology and Pediatrics at the University of Wisconsin, the death of Tyler Kloes was from asphyxia. According to Dr. Gilbert, the extensive edema and congestion in the brain and the extent of the petechial hemorrhaging in the lungs and thymus were strongly supportive of an asphyxial death.

Dr. Gilbert testified that the slides in the Kristin Hamilton case exhibited petechia in the lungs, thymus, and more significantly in the larynx and neck. In addition, Dr. Gilbert testified that on gross examination of the exhumed body of Kristin Hamilton, she observed extensive petechia in the lungs, hemorrhag-

ing on the gums, as well as hemorrhaging in the retina and sclera of the eyes. In light of these findings, it was Dr. Gilbert's opinion that this was an asphyxial death. In the doctor's opinion, a towel tied around an infant's mouth could cause asphyxia.

Dr. John Emery, a pediatric pathologist from Sheffield, England, examined slides, reports and photos relating to the three cases. In Dr. Emery's opinion, the death of Kristin Hamilton was no doubt an asphyxiation by external means. The doctor based his conclusion on the absence of disease or infection, the petechia in the lung, some bleeding in the connective tissue of the neck, and particularly the bruising on the gums and the other doctors' descriptions of hemorrhaging in the eyes. Dr. Emery testified that the death was probably due to something obstructing the mouth from the outside, noting that the line across the mouth was consistent with something restricting the mouth. He noted a towel tied around the mouth could suffocate a child if it became wet and impervious to air.

With regard to Tyler Kloes, Dr. Emery concluded that the death was compatible with death by asphyxia of an external type. He testified that there was no suggestion that any of the deaths were accidental.

Dr. Emery testified that the deaths most likely fit into a pattern where the children were looked after in such a way that created an "asphyxia-producing situation during the time they were cared for." Dr. Emery explained the situation as most likely an "abnormal psychosocial reaction to a crying situation of the child."

Dr. Frederick Zugibe, Chief Medical Examiner of Rockland County, New York, consulted on these cases with Dr. Gilbert in November 1985. Dr. Zugibe testi-

fied that Dr. Gilbert contacted him after the exhumations and discussed her findings, including the hemorrhaging in the eyes and jaws of Kristin Hamilton. Zugibe was sent the jaws, certain lung tissue, photographs of these organs, and the initial autopsy reports of the three children.

Dr. Zugibe concluded as follows:

> [I]t would be my opinion in this case, I would cluster them all together as asphyxial deaths due to external asphyxiation. And I would even go further than that; I would call it homicide. As a medical examiner, I would rule it as a homicide.

Dr. Zugibe also testified that a properly conducted initial autopsy would have revealed the hemorrhaging on the gum line. Dr. Zugibe stated that there was a good possibility that the pathologists conducting the original autopsy simply missed the bruising on the gums.

From this evidence, the jury could conclude beyond a reasonable doubt that the death of Tyler Kloes, as well as Kristin Hamilton, were homicides. The jury could also infer that Sandra Pankow caused the deaths of both Tyler Kloes and Kristin Hamilton. Contrary to Pankow's insistence, it is not dispositive that a substantial dispute existed among some of the experts as to the cause of death. Pankow misses the fundamental point that the differences in the medical experts' conclusions simply created a question of credibility for the jury, not this court, to resolve. The jury was properly instructed to give the expert testimony the weight it deserved.

The evidence was sufficient to convince the jury to a moral certainty that there was no reasonable

hypothesis of innocence if it believed, which it apparently did, the evidence most favorable to the prosecution. The evidence of homicidal asphyxiation, if believed, excluded SIDS or accidental misadventure as a cause of death. The jury was justified in disbelieving Pankow's testimony that Kristin Hamilton and Tyler Kloes were sleeping in upstairs bedrooms when she purportedly discovered their bodies.

The jury was also justified in rejecting Pankow's suggestion that her son Christopher caused the deaths. Significantly, Sandra Pankow was the only individual in this case observed to have tied a towel around the mouth of an infant. Although Christopher Pankow was called as a defense witness to testify that he had tied up babies, the jury had the right from its observations of Christopher and the other witnesses to select which of Christopher's statements, if any, were true.

## MATHEMATICAL PROBABILITY EVIDENCE

The second claim of error concerns the admissibility of mathematical probability evidence. Dr. Robert Hauser, Sociological Statistician at the University of Wisconsin-Madison, was contacted by Dr. Gilbert to assist in confirming her conclusion that the deaths could not be attributed to SIDS. Hauser was asked to determine the statistical probability of three infants dying of SIDS in the same household during a five-year period, given twenty children were cared for in the home, the deaths occurred after 9 a.m., and the children were over six months of age. Dr. Hauser was also supplied with certain generally accepted data: two SIDS deaths occur per 1,000 live births; 90% of

SIDS deaths occur under six months of age; and 90% of SIDS deaths occur between midnight and 9 a.m. Using a binomial distribution method, Dr. Hauser determined the probability to be one thousand times smaller than 9.1 in one trillion. Stated another way, such an event would occur by chance every 600,000 years.

Pankow filed a motion in limine seeking to exclude testimony relating to the mathematical probability evidence. In support of the motion, Pankow argued that in all cases it is error to permit an expert witness to testify as to mathematical probabilities that are offered to show that the defendant was the person who committed the crime. Pankow argued that such evidence invaded the province of the jury, and improperly attempted to quantify the reasonable doubt standard. Pankow also argued that the mathematical probability evidence lacked foundation, essentially being an unreliable guess on the part of the statistician, and that its prejudicial effect outweighted its probative value.

■

Pankow's argument is misplaced. Statistical evidence is not inadmissible per se. *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir. 1986), *cert. denied*, 107 S. Ct. 1337 (1987). The general view in the cases relied upon by Pankow is that mathematical probability evidence may not be admitted to prove identity, that is, that it was the defendant who committed the crime. However, the evidence was not introduced in the present case to prove identity nor to prove cause. The sole purpose was to meet Pankow's defense theory that the deaths were attributable to SIDS. *See United States v. Gerry*, 515 F.2d 130, 142 (2d Cir. 1975), *cert. denied*, 423 U.S. 832 (1975).

Contrary to Pankow's insistence, the statistical evidence did not assign a cause to the deaths. It simply sought to eliminate SIDS as a cause. It does not follow that the evidence amounted to an opinion as to the cause of death merely because it demonstrated the improbability of SIDS as a cause.

The prosecution did not argue, or even obliquely suggest, that the unlikelihood of three SIDS deaths occurring in the same household could in any way be used to predict the odds that the cause of death was homicide or that Pankow was guilty. *See Gwaltney,* 790 F.2d at 1383. There is no support for Pankow's suggestion that the prosecution employed the statistics in an attempt "to assign a number to the probability of guilt or innocence." *See id.* (quoting *People v. Collins,* 438 P.2d 33, 40 (Cal. 1968)). Accordingly, we do not consider that the evidence improperly invaded the province of the jury with an opinion of guilt or improperly attempted to quantify the reasonable doubt standard.

Furthermore, the mathematical probability evidence in the cases relied upon by Pankow generally suffered from a foundational deficiency. For instance, in *Collins,* the victim was robbed by a woman wearing a blond ponytail who was driven from the scene of the robbery by a black male wearing a beard. At trial, the prosecution called an instructor of mathematics. Through this witness he sought to establish that, assuming the robbery was committed by a white woman with a ponytail whose companion was black, there was an overwhelming probability that the crime was committed by any couple answering such distinctive characteristics. *Id.* at 36. The prosecution then, without presenting any statistical evidence whatso-

ever, argued that there was a probability of but one chance in twelve million that any couple would possess the distinctive characteristics of the defendants. *Id.* at 37. On appeal, the court held that a foundation for the admissibility of the witness' testimony was not established. His testimony was neither made to rest on his own testimonial knowledge nor based upon valid data. *Id.* at 39; *see also People v. Risley,* 108 N.E. 200 (N.Y. 1915); *State v. Sneed,* 414 P.2d 858, 861–62 (N.M. 1966), *aff'd,* 435 P.2d 768 (1967).

Similarly, the Arkansas Supreme Court in *Miller v. State,* 399 S.W.2d 268, 270 (Ark. 1966), stated:

> [The expert witness] had made no tests on which he could reasonably base his probabilities of one in ten on soil color, one in one hundred on soil texture, or one in one thousand on soil density (which he multiplied together to obtain his one-in-one-million figure), nor did he base his testimony on studies of such tests made by others. He admitted that *his figures were predicted on "estimates" and "assumptions." In short, there is no foundation upon which to base his probabilities of one in a million.* (Emphasis added).

 In contrast, the statistics in the present case were derived from generally accepted medical data. Indeed, in her brief on appeal, Pankow concedes that she has no objection to the underlying basis for the probability estimate, for example, that two SIDS deaths occur in the United States per 1,000 live births, and that 90% of these cases involve children under six months of age. A proper foundation was laid for the admission of the statistical conclusion.

Pankow does not dispute Dr. Hauser's qualifications as a statistician, and Pankow did not object at trial to the relevancy of his testimony. Nevertheless, Pankow argues that it is impermissible to extend the reporting of known rates of occurrences "to the presentation of complex numerical estimates of the likelihood of a particular event taking place." Pankow contends that probability calculations as "awesome as those reported by Dr. Hauser are likely to overshadow any critical independent determination of causation."

We disagree. Pankow has not adequately suggested how the mathematical computation of these medically accepted rates of occurrences was so potentially overshadowing or confusing so as to require exclusion of the evidence as a matter of law. Indeed, Pankow's claim that the evidence was cloaked in "an aura of scientific reliability" is undercut by the jury's acquittal of Pankow on the Shawn Bloomer charge.

We agree with the trial court that the evidence was relevant and an aid to the jury with respect to the question whether the deaths were natural. Any potential prejudice was not so weighty as to render the admission of the evidence an abuse of discretion as a matter of law. While the "interjection into the criminal trial process of sophisticated theories of mathematical probability raises a number of serious concerns," *United States ex rel. DiGiacomo v. Franzen,* 680 F.2d 515, 518 (7th Cir. 1982), under the facts of this case the admission of the mathematical probability evidence did not constitute a denial of due process or Pankow's right to a fair trial. *See id.*

## PRESERVATION OF EVIDENCE

The third issue concerns the alleged failure to effectively preserve physical evidence, specifically the eyes and jaws of Kristin Hamilton. During the post-exhumation autopsy, gross examination of the jaws revealed discoloration in the gum line. The eyes were removed, and gross examination also revealed hemorrhaging in the retinas. The pathologists sectioned the eyes and jaws for further microscopic study. The tissue proved too decomposed, however, for effective microscopic analysis. Pankow argues that she was denied due process because the eyes and jaws were essentially rendered unsuitable for defense examination by this procedure.

This issue is controlled by *California v. Trombetta,* 467 U.S. 479 (1984).[1] In *Trombetta,* the Supreme Court held that California's failure to preserve breathalyzer samples for defense examination did not violate the due process clause. The court looked at three factors in determining that the state was not obligated to preserve the physical evidence: First, the state had destroyed the breath sample in good faith compliance with its normal practices. *Id.* at 488. Second, the evidence did not possess exculpatory value that was

---

[1]A series of Supreme Court decisions developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *Id.* at 485; *see, e.g., Napue v. Illinois,* 360 U.S. 264 (1959); *Brady v. Maryland,* 373 U.S. 83 (1963); *United States v. Agurs,* 427 U.S. 97 (1976). However, these cases involved the government's alleged *suppression* of evidence that still existed and was therefore readily available for court inspection and assessment of its exculpatory value. It was not until *Trombetta* that the Supreme Court addressed the very different circumstance of whether the government is also required to *preserve* evidence for criminal defendants. *Trombetta,* 467 U.S. at 486–87.

apparent before the evidence was destroyed. *Id.* at 489. Third, the evidence was such that the defendant would be able to obtain comparable evidence by other available means. *Id.*[2]

These factors do not require the reversal of the Kristin Hamilton conviction. First, the record reveals not the slightest hint that the pathologists destroyed the evidence in bad faith in an effort to circumvent disclosure requirements.[3] Indeed, the trial court specifically found that (1) the failure to preserve the evidence was not willful or intentional, and (2) the post-exhumation autopsy procedures were in accord with normal practice. These trial court findings are not clearly erroneous. *See* sec. 805.17(2), Stats.

Second, the failure to preserve the evidence is without constitutional defect. The eyes and jaws had no exculpatory value that was apparent to those who had custody of the evidence when sectioned for

[2]We adopted the *Trombetta* criteria in *State v. Oinas,* 125 Wis. 2d 487, 490, 373 N.W.2d 463, 465 (Ct. App. 1985).

[3]The trial court concluded that there had been full and adequate disclosure. The court noted that the eyes were removed on December 18, 1985. After gross examination revealed hemorrhaging, further study was attempted microscopically. Pankow filed a motion for discovery on February 21, 1986, and specifically requested an opportunity to examine the eyes on April 3, 1986. The eye sections prepared for microscopic examination and also the eye portions preserved in parafin were then provided for defense examination. The record suggests that in late April or early May, it was understood by the parties that defense counsel would take his experts to University Hospitals to view the evidence. For whatever reason, the defense evidently chose not to finalize their arrangements. A similar suggestion appears in the record regarding opportunities to examine the jaws.

microscopic study. *See Oinas,* 125 Wis. 2d at 490, 373 N.W.2d at 465. Indeed, gross examination had just revealed its inculpatory nature. *See Trombetta,* 467 U.S. at 489. Pankow's claim that defense examination would have produced exculpatory evidence is speculative. Due process does not require the state to preserve evidence that is merely potentially exculpatory. *State v. Holt,* 128 Wis. 2d 110, 132, 382 N.W.2d 679, 690 (Ct. App. 1985).

In fact, Pankow's suggestion that defense examination might have shown the absence of hemorrhaging ignores the photographs of the jaws, taken at the time of excision, revealing the discoloration discovered on gross examination. Pankow's argument that her medical experts would have provided independent interpretation of the discoloration goes more to the weight of the evidence than to the evidence's exculpatory value that was apparent before it was destroyed. *See United States v. Martinez,* 744 F.2d 76, 80 (10th Cir. 1984).

Finally, Pankow was not without alternative means to demonstrate her innocence. Pankow extensively cross-examined the observations and reports of the state's medical experts and presented conflicting testimony. *See Trombetta,* 467 U.S. at 490. In addition, Pankow had access to the photographs of the excised jaws. Finally, other internal organs including the lungs remained suitable for defense examination.

By these alternative means, Pankow retained the right to raise the same issues and create the same doubt that could have been raised and created by use of the destroyed evidence. Just as the defendants in *Trombetta* could raise doubts in the minds of the jury by calling into question the reliability of the test or

the competence of the administering officer, Pankow was free to raise doubts about the pathologists' medical procedures and conclusions. Under *Trombetta,* what matters was that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence. *Elmore v. Foltz,* 768 F.2d 773, 778 (6th Cir. 1985).

## STRIKING OF "OTHER ACTS" TESTIMONY

Pankow's fourth claim of error is based upon her assertion that the trial court improperly denied a motion for mistrial based on the admission and subsequent striking of "other acts" testimony.

Cathy Stockwell, a working mother of three children, engaged Pankow as a baby-sitter from November, 1983, until January, 1984. She was called to describe complaints over the quality of care her children received.

Pankow moved to exclude Stockwell's testimony on several occasions prior to her appearance. In a pretrial motion in limine, Pankow sought to exclude the testimony on grounds of hearsay and remoteness in time from the charged murders. The trial court declined to issue a definitive ruling at that time, noting that it was reluctant to provide an advance ruling on an evidentiary issue until it was developed at trial.

Shortly before Stockwell was called at trial, Pankow renewed her motion in limine, contending that the testimony would relate to irrelevant activities of a negligent nature and thus constituted improper "other acts" evidence under sec. 904.04(2). Pankow also renewed her claim that the events were remote in time.

The trial court denied the motion. Regarding the sec. 904.04(2) objection, the court notes that an element of the charged offense is that of acts evincing a depraved mind. The court stated that it did not know if Stockwell's trial testimony would reflect merely negligent conduct, and that if the testimony indicated prior conduct evincing a depraved mind, it was probative in showing elements of the crime charged and thus admissible under sec. 904.04(2). Furthermore, the events were not remote in time because Pankow baby-sat the Stockwell children during the five-year period in which the three deaths occurred.

Stockwell thereafter testified as to Pankow's various conduct with regard to her children. None of the testimony revealed conduct evincing a depraved mind. Stockwell testified that her youngest child often got diaper rash because she was not changed often enough. She further testified that Pankow was sometimes not home when the children were dropped off and that occasionally the children were not fed.

Immediately after Stockwell's testimony, the trial court excused the jury and, on its own motion, correctly declared that Stockwell's testimony was in fact irrelevant to the crimes charged, describing mere acts of negligence. Pankow then moved to strike the testimony and also moved for a mistrial. The trial court ordered the testimony struck but denied the mistrial motion. Upon returning to the court room, the jury was instructed that Stockwell's testimony was to be disregarded in its entirety.

Pankow argues on appeal that even though the testimony was stricken and the jury was instructed to disregard it, the references to the negligent acts were so prejudicial that a declaration of a mistrial was required. We disagree.

The decision whether to grant a motion for a mistrial lies within the sound discretion of the trial court. *Haskins v. State,* 97 Wis. 2d 408, 419, 294 N.W.2d 25, 33 (1980). The trial court must determine, in light of the whole proceeding, whether the claimed error was sufficiently prejudicial to warrant a new trial. *State v. Grady,* 93 Wis. 2d 1, 13, 286 N.W.2d 607, 612 (Ct. App. 1979). The denial of a motion for mistrial will be reversed only on a clear showing of an abuse of discretion by the trial court. *Johnson v. State,* 75 Wis. 2d 344, 365, 249 N.W.2d 593, 604 (1977).

We conclude that the trial court did not abuse its discretion. Furthermore, any prejudicial effect that might have flowed from the testimony was cured by the court's immediate instruction to the jury to disregard the testimony in its entirety. *State. v. Medrano,* 84 Wis. 2d 11, 25, 267 N.W.2d 586, 592 (1978). Pankow's argument incorrectly assumes that the jury violated its duty to decide the case solely on the evidence in the record, contrary to the court's instruction. *See State v. Leach,* 124 Wis. 2d 648, 673, 370 N.W.2d 240, 253–54 (1985).

## INTEREST OF JUSTICE

Finally, Pankow contends that she should be granted a new trial in the interest of justice. In order for this court to exercise its discretionary power under sec. 752.35, it must appear from the record that the real controversy has not been tried or that it is probable that justice has miscarried. We are unpersuaded that Pankow was denied a fair trial.

*By the Court.*—Judgment affirmed.