IN RE the COMMITMENT OF Reuben ADAMS:

STATE of Wisconsin, Petitioner-Respondent,

v.

Reuben ADAMS, Respondent-Appellant.†

Court of Appeals

*No. 96–3136. Oral argument July 21, 1998.—Decided November 10, 1998.*

(Also reported in 588 N.W.2d 336.)

†Petition to review denied.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Richard D. Martin*, assistant state public defender. There was oral argument by *Richard D. Martin*.

On behalf of the petitioner-respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general. There was oral argument by *Sally L. Wellman*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

SCHUDSON, J. Reuben Adams appeals from the trial court order, following a jury trial, committing him to a secure mental health facility as a sexually violent person under ch. 980, STATS. Presenting issues of first impression, he argues: (1) the evidence was insufficient to support the jury's verdict finding him a sexually violent person because his diagnosis—"antisocial personality disorder"—uncoupled with any other diagnosis, does not constitute "a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence," as required by the definition of "sexually violent person" under § 980.01(7), STATS.;[1] and (2) in the alternative, if "antisocial personality disorder" is a diagnosis that satisfies the "mental disorder" criterion of the definition of "sexually violent person" under § 980.01(7), and if, as a result, the evidence was sufficient to support the jury's verdict finding him a sexually violent person, then § 980.01(7) is unconstitutional as applied because, he

---

[1] Section 980.01(7), STATS., provides:

"Sexually violent person" means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

contends, "antisocial personality disorder" is too impre-
cise to satisfy the requirements of due process.

Adams also argues: (1) the evidence was insuffi-
cient because neither of the State's experts gave
testimony that would allow the jury to find beyond a
reasonable doubt that he was "substantially probable"
to "engage in acts of sexual violence," as required under
§ 980.01(7), STATS.; (2) the State denied his rights to
silence and due process by eliciting testimony about his
refusal to submit to an interview with one of the psy-
chologists who sought to examine him; (3) the trial
court's evidentiary rulings denied him due process by
restricting his right to confront witnesses and by
allowing the State to ask leading questions; and (4) the
trial court erred in denying his motion for mistrial
when the State allegedly violated a pre-trial ruling pre-
cluding any reference to a dismissed sexual assault
charge.

We conclude that a diagnosis of "antisocial person-
ality disorder," uncoupled with any other diagnosis but
coupled with sufficient evidence establishing that a
defendant is a "sexually violent person," may consti-
tute "a mental disorder that makes it substantially
probable that the person will engage in acts of sexual
violence," under § 980.01(7), STATS. We also conclude
that, in allowing "antisocial personality disorder" to
meet the "mental disorder" criterion, § 980.01(7) is suf-
ficiently precise to satisfy due process. We also reject
Adams's four other arguments and, therefore, affirm.

## I. BACKGROUND

On August 6, 1994, the State filed a petition alleg-
ing that Adams was a sexually violent person eligible
for commitment under ch. 980, STATS. On April 10,
1995, the trial court dismissed the petition, concluding

that ch. 980 was unconstitutional. Shortly thereafter, however, the supreme court decided *State v. Carpenter*, 197 Wis. 2d 252, 541 N.W.2d 105 (1995), and *State v. Post*, 197 Wis. 2d 279, 541 N.W.2d 115 (1995), upholding ch. 980 against various constitutional challenges. As a result, this court summarily reversed the trial court's dismissal of the petition and remanded Adams's case. A week-long jury trial followed, details of which will be related in the discussion of each issue.

## II. ANTISOCIAL PERSONALITY DISORDER

Adams does not dispute that, if "antisocial personality disorder" satisfies the "mental disorder" requirement of § 980.01(7), STATS., then the evidence was sufficient to support the jury's finding that he is a sexually violent person. Indeed, the State offered essentially undisputed evidence establishing Adams's history of sexual assault offenses, recidivism, denial of responsibility, refusal of sex offender treatment, and diagnosis of "antisocial personality disorder."

Adams argues, however, that the testimony of the State's experts, Dr. Kenneth Diamond and Dr. Ronald Sindberg, established not only that he suffers from "antisocial personality disorder," but also that "antisocial personality disorder" does *not* constitute a "mental disorder that makes it substantially probable that the person will engage in acts of sexual violence" under § 980.01(7), STATS. He points out that: (1) Dr. Diamond conceded that "the vast majority of criminals" he had "encountered" have an "antisocial personality disorder," but that less than five percent of "those who have antisocial personality disorder . . . commit sexual

offenses,"[2] and (2) Dr. Sindberg testified that, in his opinion, "[t]hat particular diagnosis ["antisocial personality disorder"] . . . sometimes, in fact quite often, predisposes diagnosed individuals to engage in sexual violence." Adams argues that neither of these apparently disparate estimates established the "substantial[ ] probab[ility]" of engaging in sexual violence, required by the statute.

Adams goes on to emphasize that, unlike the diagnoses in many cases involving challenges to sexually violent person commitments, including those in *Carpenter* and *Post*, his diagnosis did not include pedophilia, any of the other paraphilia, or any diagnosis other than antisocial personality disorder. Thus, he relies on (1) § 980.01(2), STATS., which, for purposes of ch. 980, defines "[m]ental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes *a* person to engage in acts of sexual violence" (emphasis added); and (2) *Post*, in which the supreme court stated, "The key to the constitutionality of the definition of mental disorder in chapter 980 is that it requires a nexus—persons will not fall within chapter 980's reach unless they are diagnosed with *a disorder that has the specific effect of predisposing them to engage in acts of sexual violence*." *Post*, 197 Wis. 2d at 306, 541 N.W.2d at 124 (emphasis added).

Interpretation of a statute presents a question of law we review *de novo*. *See State v. Petty*, 201 Wis. 2d 337, 354–55, 548 N.W.2d 817, 823 (1996). If the terms

---

[2] Dr. Diamond was not asked to clarify whether he meant less than five percent of the general population with "antisocial personality disorder," or less than five percent of the *prison* population with "antisocial personality disorder."

of the statute are clear and unambiguous, we apply them as written, without further inquiry into their history. *See State v. Swatek*, 178 Wis. 2d 1, 5, 502 N.W.2d 909, 911 (Ct. App. 1993). Here, we conclude that the explicit language of § 980.01(2), STATS., together with *Post*, refutes Adams's argument.

Revealingly, at oral argument, counsel for Adams acknowledged that if § 980.01(2), STATS., like § 980.01(7), STATS., referred to "the person" rather than "a person," his argument would be much less persuasive. He was correct and, indeed, only the difference between "a" and "the" provides *any* theoretical support for Adams's argument. As we will explain, however, it is support that collapses under the weight of ch. 980—by both its explicit terms and the recent case law interpreting them.

If, in its definition of "[m]ental disorder," § 980.01(2), STATS., limited those who could be committed as sexually violent persons to those suffering from a "condition affecting the emotional or volitional capacity that predisposes" persons, *generally*, "to engage in acts of sexual violence," then Adams would be correct. After all, as Adams contends, neither Dr. Diamond nor Dr. Sindberg testified that "antisocial personality disorder," *generally*, produces that predisposition such that persons, *generally*, with that diagnosis, are "substantially probable" to "engage in acts of sexual violence." *See* § 980.01(7), STATS. But Adams simply misinterprets § 980.01(2) and, as a result, presents a theory that is incompatible with § 980.01(7) and with the very passage from *Post* on which he relies.

Section 980.01(2), STATS., does not define "mental disorder" as a condition that, *generally*, predisposes "people," or "persons," or the "prison population," or even the "mentally disordered population" to engage in

67

sexual violence. It simply refers to "a person." And who is that person? Under § 980.01(7), that person can be no one other than the specific individual—the subject of the petition—who is "*a* person" who meets the statutory prerequisites "and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that *the* person will engage in acts of sexual violence." (Emphasis added.)

Similarly, *Post* does not state that "[t]he key to the constitutionality of the definition of mental disorder" is a nexus linking the subject of a petition to a mental disorder that, *generally*, predisposes "people," or "persons," or the "prison population," or even the "mentally disordered population" to engage in sexual violence. Instead, *Post* clarifies that "persons will not fall within chapter 980's reach unless *they* are diagnosed with a disorder that has the specific effect of predisposing *them* to engage in acts of sexual violence." *Post*, 197 Wis. 2d at 306, 541 N.W.2d at 124 (emphasis added). Thus, *Post* requires that the statutory focus be on *the* person who is the subject of the petition, and hinges its holding on the specific link between *that* person's mental disorder and the effect of *that* mental disorder on *that* person. Indeed, to conclude otherwise would be to hold that the legislature, inexplicably, chose to *exclude* from potential commitment *all* persons diagnosed solely with "antisocial personality disorder," regardless of their history of sex crimes, recidivism, denial, and refusal of treatment. This would be a dangerously absurd reading of the statute. *See State v. Clausen*, 105 Wis. 2d 231, 245, 313 N.W.2d 819, 826 (1982) (we will not interpret a statute in a way that renders an absurd result). Accordingly, we conclude that, under ch. 980, a person who has the mental disor-

der of "antisocial personality disorder," uncoupled with any other mental disorder, may be found to be a "sexually violent person."

## III. CONSTITUTIONALITY

Adams next argues that if ch. 980, STATS., allows, as we have just concluded, for commitment of one who is diagnosed with nothing more than an "antisocial personality disorder," then "the statute is unconstitutional as applied, because an antisocial personality disorder is too imprecise a category to pass due process muster." We disagree.

We review a challenge to the constitutionality of a statute *de novo. See Post,* 197 Wis. 2d at 301, 541 N.W.2d at 121. We presume the constitutionality of legislative enactments and we indulge every presumption favoring the validity of the statute. *See id.* Further, one challenging a statute's constitutionality bears the burden to prove unconstitutionality beyond a reasonable doubt. *See id.*

As the supreme court reiterated in *Post,* "A statute must be narrowly enough drawn that its terms can be given a reasonably precise content and those persons it encompasses can be identified with reasonable accuracy." *Id.,* 197 Wis. 2d at 303, 541 N.W.2d at 122. Implicit in our rejection of Adams's first argument is the conclusion that "antisocial personality disorder" can be a "condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence" and, thus, does constitute a "mental disorder," as defined in § 980.01(2), STATS. We now additionally conclude that the inclusion of "antisocial personality disorder" as, potentially, a "condition" qualifying as a "mental disorder" under the statute

does not render the statute unconstitutionally imprecise.

Adams, maintaining that "antisocial personality disorder," uncoupled with any other diagnosis, is insufficiently precise to allow for commitment, again emphasizes that *Post* and *Carpenter* involved defendants diagnosed not only with antisocial personality disorders, but also with conditions including "atypical paraphilia" and "sexual sadism." Adams also invokes Justice Anthony Kennedy's concurring opinion in *Kansas v. Hendricks*, 521 U.S. 346, —, 117 S. Ct. 2072, 2087 (1997), in which the Supreme Court rejected constitutional challenges to Kansas's sexual predator commitment law. Justice Kennedy wrote that "if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." *Id.* at —, 117 S. Ct. at 2087 (Kennedy, J., concurring).

We have little quarrel with the premises on which Adams relies. They do not, however, lead to his conclusion. After all, for the reasons we explained in the preceding section, the fact that the defendants in *Post* and *Carpenter* suffered from additional conditions does not preclude the commitment of persons diagnosed only with "antisocial personality disorder." And the fact that "antisocial personality disorder," standing alone without any other diagnosis *or evidence*, could never lead to a finding that a defendant, without a history of sex offenses, is a "sexually violent person," does not mean that that condition, *in combination with evidence satisfying the additional criteria of § 980.01(7),* Stats., *cannot constitutionally support that finding.*

70

Adams offers nothing to suggest that "antisocial personality disorder," in and of itself, is so imprecise as to defy definition. On the contrary, he concedes that it is a legitimate, psychiatrically defined condition, but he brings his challenges in large part because the disorder affects so many who are not sexually violent. But, even assuming that the diagnosis of "antisocial personality disorder" is relatively common, the countless citizens who suffer from it are not *ipso facto* vulnerable to commitment under ch. 980, STATS. Only the relatively few who *also* satisfy the remaining criteria of § 980.01(7), STATS., may be found to be "sexually violent persons." It is that additional coupling that, in Justice Kennedy's words, "offer[s] a solid basis for concluding that civil detention is justified." *Hendricks*, 521 U.S. at —, 117 S. Ct. at 2087. Therefore, we conclude that "antisocial personality disorder" is sufficiently precise to satisfy the criterion of "mental disorder" under § 980.01(7), STATS.

## IV. SUFFICIENCY OF THE EVIDENCE

Adams argues that "[t]he evidence was insufficient because neither of the State's experts gave testimony that would allow the jury to find beyond a reasonable doubt that [he] was substantially likely to commit another sexually violent offense." He explains that his "position is simple"—that the State "was required to establish that it is 'substantially probable' that he will commit another sexually violent offense," but that the State's expert witnesses "could only testify that it was probable." Once again, he points to the testimony of Dr. Diamond and Dr. Sindberg and contends, "To commit [him] as a 'sexually violent person' . . . where the [S]tate's own witnesses cannot even say that the likeli-

71

hood of reoffending is greater than 50%, renders the word 'substantially' in the statute mere surplusage."

The parties debate the meaning of "substantially probable." Adams argues that "substantial probability" means "extreme likelihood" or "much more likely than not," and that "the showing of future harm must be highly probable." The State responds: (1) "substantial probability" means "more likely than not;" (2) evidence together with and in addition to the psychologists' testimony establishes "substantial probability;" and (3) in any event, even under the definition Adams has proposed, and even limiting the analysis to the psychologists' testimony, the evidence was sufficient.

Subsequent to the briefing in this case, this court decided *State v. Kienitz*, 221 Wis. 2d 275, 585 N.W.2d 609 (Ct. App. 1998), *rev. granted.* We concluded that under § 980.01(7), STATS., " 'substantially probable' means 'considerably more likely to occur than not to occur.' " *Id.* at 282, 585 N.W.2d at 612. We also concluded that the correct standard for reviewing challenges to the sufficiency of evidence in a ch. 980, STATS., commitment appeal is the standard applied in criminal cases:

> [W]e reverse only if the evidence, viewed in the light most favorable to the verdict, is so insufficient in probative value and force that it can be said as a matter of law that no reasonable trier of fact, acting reasonably, could have found [it substantially probable that the person will engage in acts of sexual violence] beyond a reasonable doubt.

*Id.* at 301, 585 N.W.2d at 619. Under that definition of "substantially probable," and under that standard of review, we conclude that the evidence in this case was sufficient.

The evidence, largely undisputed, included information about Adams's history of sexually violent crimes, history of non-sexual crimes and antisocial behavior, failures under court-ordered supervision, denial of responsibility, refusal to participate in sexual assault treatment programs and drug/alcohol treatment programs, and his sexual offense recidivism. Further, the psychologists' testimony was more supportive of the State's position than Adams claims. Dr. Diamond testified that Adams is "a risk and it's highly probable that he would recommit and reoffend." Dr. Sindberg testified that, based on his evaluation of thirty-one risk factors, there was "a substantial probability that [Adams] will reoffend or recommit a sexually violent act," and that, in his analysis, he considered "substantial probability" to mean "much more probable than not."

Thus, as the State argues, the psychologists' testimony, standing alone, may very well have satisfied the standard.[3] Unquestionably, however, their testimony in combination with the other evidence provided a sufficient basis for the jury to conclude beyond a reasonable doubt that Adams is dangerous because he suffers from a mental disorder that renders him substantially probable to engage in acts of sexual violence.

---

[3] Indeed, in this case, the converse may be true—i.e., the evidence, *not* including the psychologists' testimony, may have been sufficient. *See State v. Kienitz*, 221 Wis. 2d 275, 304, 585 N.W.2d 609, 621 (Ct. App. 1998) ("We . . . conclude that there may be sufficient evidence that acts of sexual violence are substantially probable, even though the fact-finder chooses not to rely on an expert opinion to that effect.").

## V. RIGHT TO REMAIN SILENT

Adams argues that "[t]he [S]tate denied [him] his rights to silence and due process by eliciting testimony concerning his invocation of the right to remain silent." In effect, Adams is contending that the trial court erred in denying his motion *in limine* to preclude any reference to his refusal to submit to an interview with Dr. Sindberg.

We agree with Adams that, under *State v. Zanelli*, 212 Wis. 2d 358, 569 N.W.2d 301 (Ct. App. 1997), the trial court incorrectly ruled that he had "no accorded right . . . to remain silent during any kind of an examination" ordered by the court under ch. 980, STATS. *See also* § 980.05(1m), STATS.[4] We also conclude, however, that because Adams challenged Dr. Sindberg and his examination for the very reason that Dr. Sindberg had failed to interview him, the trial court correctly allowed the State to elicit Dr. Sindberg's testimony about Adams's refusal, for the purpose of rebutting the implication that, by not interviewing Adams, Dr. Sindberg had failed to conduct a proper examination before rendering his opinion. *See State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679, 687 (Ct. App. 1985) ("It is well-established that if a trial court reaches the proper result for the wrong reason, it will be affirmed.").

Before opening statements, Adams's counsel asked the trial court to "grant the motion in limine precluding any reference to the defendant's assertion of his Fifth Amendment privilege and right to remain silent." He

---

[4] Section 980.05(1m), STATS., provides:

At the trial to determine whether the person who is the subject of a petition under s. 980.02 is a sexually violent person, all rules of evidence in criminal actions apply. All constitutional rights available to a defendant in a criminal proceeding are available to the person.

explained that "while this may not necessarily apply to Dr. Diamond" who did interview Adams after advising him of his right to remain silent, the motion "certainly appl[ied] to Dr. Sindberg" because he "did what's euphemistically referred to [as a] dry lab"—an examination, relying on the reports of others, without a personal interview. Significantly, however, arguing in support of his motion *in limine,* counsel insisted not only that the State be precluded from referring to Adams's refusal, but also that the defense be allowed to challenge Dr. Sindberg's examination precisely because Dr. Sindberg failed to interview Adams.

> [DEFENSE COUNSEL]: . . . Sindberg went to Mr. Adams and said, I have to do a follow-up interview, and Mr. Adams said likely, I'm not going to answer any questions upon advice of counsel.
>
> So then what Dr. Sindberg did, he did his examination based on whatever collateral information he had without ever doing a clinical interview of the defendant.
>
> THE COURT: So the defendant refused to talk to him and he didn't interview him because he said, I'm asserting my fifth?
>
> [DEFENSE COUNSEL]: That's right.
>
> THE COURT: You want me to preclude the state from examining Dr. Sindberg on the issue of I went to talk to him and he refused?
>
> [DEFENSE COUNSEL]: That's correct.
>
> THE COURT: Do you [the prosecutor] intend to do that?
>
> [PROSECUTOR]: Well, actually I thought that that was going to be one of the defense things they would bring up, [Adams] never talked to . . . Dr. Sindberg. If they do that, then I think it's fair game to say I asked and he said no.

75

THE COURT: Do you [defense counsel] agree with that?

[DEFENSE COUNSEL]: No, I don't at all.

The problem with this statute is that it's sort of like the Lord giveth and taketh away. We are going to give you constitutional rights but so help you if you assert them. That's what he did here. This man asserted his privilege.

Now, what the state wants to do is say, okay, now we are going to do a dry lab analysis which obviously go[es] into the ethics of doing that. That's what they have to live with.

THE COURT: You don't have to go through with that. It's pretty simple. Came to see him, had a Fifth Amendment right . . . not to see, speak and not to speak, and he chose not to speak, and you are asking me to direct the state not to use that . . . assertion of this right against him in this case?

[DEFENSE COUNSEL]: That's correct.

THE COURT: Even if you examine the doctor and challenge him on his findings, by saying, you relied on, doctor, "X" reports and the parole agent's materials, and you didn't talk to him directly, did you?

[DEFENSE COUNSEL]: Yes, ma'am.

THE COURT: And you don't want a follow-up of that? Well, you did go to see him, didn't you?

[DEFENSE COUNSEL]: No.

True to defense counsel's forecast, co-defense counsel, in opening statement, advised the jury:

You will have a chance to evaluate [Dr. Diamond and Dr. Sindberg], their credentials, the way they evaluated Mr. Adams, whether their evaluation was consistent with ethical cannons [sic] of their profession . . . whether they did everything

76

that they needed to do to reach the opinion that they're going to give you . . . .

. . . .

And it's important for you to understand how, not only Dr. Diamond, but the other psychologists reached their opinions. That's—that's really important here.

Moreover, defense counsel, cross-examining Dr. Diamond, challenged Dr. Diamond's understanding that the *Ethical Principles of Psychologists and Code of Conduct* did not "strictly prohibit[ ] [a psychologist from] render[ing] an opinion without having examined the client." Then, before Dr. Sindberg testified, defense counsel, outside the presence of the jury, reiterated, "I will go into the ethics and propriety of rendering an opinion which is basically referred to as dry lab," and asserted that "if [Dr. Sindberg] follows the rules of ethics, and he says I haven't talked to the man, I can't render an opinion, then we wouldn't be here."[5]

---

[5] Adams claims that the State's questioning of Dr. Sindberg caused him to challenge Dr. Sindberg's professional conduct. This chronology, however, clarifies that, *before the presentation of any evidence, the defense explicitly advised the trial court that it intended to impeach Dr. Sindberg for rendering an opinion without personally examining Adams* and, despite such impeachment, that it maintained that the State should be foreclosed from eliciting any information about Adams's refusal to be interviewed. Thus, the record refutes appellate defense counsel's misleading statements in his reply brief and supplemental reply brief:

> The state suggests that it elicited the references to Mr. Adams' silence merely to rebut his attempted impeachment of Dr. Sindberg for not conducting a personal interview. This claim is absolutely inconsistent with the record. Appellant moved *in limine* to prohibit any reference to this silence before the evidentiary portion of the trial had commenced.

Recently, in *Zanelli*, this court concluded that, under § 980.05(1m), STATS., a ch. 980 defendant's Fifth Amendment right to remain silent was violated when, at trial, the psychologist ordered to conduct an evaluation testified about, and the prosecutor commented on, the defendant's refusal to speak to the psychologist. *Zanelli*, 212 Wis. 2d at 369–72, 569 N.W.2d at 306–07. We did not, however, consider whether such testimony and comment would have been permissible if the defendant had challenged the ethics of the psychologist for rendering an opinion without having personally examined the defendant. Even more recently, however, in *State v. Keith*, 216 Wis. 2d 61, 573 N.W.2d 888 (Ct. App. 1997), we did so.

In *Keith*, we reiterated that "there are circumstances where comment [on a defendant's silence] is permitted." *Id.* at 80, 573 N.W.2d at 897. *See also State v. Wedgeworth*, 100 Wis. 2d 514, 302 N.W.2d 810 (1981).[6] Rejecting the defendant's claim that his Fifth

(Emphasis and underlining in original.)

> This would be a different case if the trial court had instead recognized that Mr. Adams had the right to silence, and that the exercise of this right could not be elicited in the state's case in chief. Then arguably, depending on the extent and nature of defense cross examination, the state *might* have an argument that the cross examination "opened the door".

(Emphasis in original; footnote omitted.)

We admonish appellate defense counsel: absolute candor with this court is essential to proper appellate practice. *See* SCR 20:3.3.

[6] In *State v. Wedgeworth*, 100 Wis. 2d 514, 302 N.W.2d 810 (1981), the supreme court explained that not all comments on a defendant's refusal to respond necessarily violate the Fifth Amendment right to silence. Commenting on a situation in which a police detective testified that the defendant provided only a brief response to a question "and [then] stopped" his

Amendment right to silence had been violated, we explained:

> Keith contends, that based on *Zanelli*, his constitutional right to remain silent was violated when the prosecutor commented on his refusal to be interviewed by the State's clinical psychologist, Dr. Miller. He points out that during the course of Miller's testimony, the State established that he asked Keith, on at least two occasions, to meet with him, but Keith "chose to exercise his option to refuse to be evaluated and declined invitations to meet with me." Additionally, during the State's closing arguments, counsel commented that Miller "tried to interview Mr. Keith, gave him several opportunities to give them some input, and Mr. Keith declined on every opportunity."
>
> However, Keith relates only part of what happened at trial. Reference to Keith's refusal to be interviewed by Miller was first made by defense counsel, in his opening statement, where he brought into question the quality of Miller's opinion because he had not conducted a clinical interview with Keith or performed psychological tests on him. . . . He also alerted the jury to the fact that Keith's expert, Dr. Beebe, had interviewed Keith and had performed psychological tests on him. Later, when he presented Beebe's testimony, Keith attempted to discredit Miller's opinion through Beebe's remarks about the detailed clinical interviews and psychological tests Beebe had conducted on Keith and

---

answer, the court stated that when testimony is "explanatory and not intended to suggest 'a tacit admission of guilt on the part of the defendant,' . . . it did not constitute an impermissible comment upon the defendant's exercise of his fifth amendment rights." *Id.* at 527, 302 N.W.2d at 817 (quoting *Reichoff v. State*, 76 Wis. 2d 375, 378, 251 N.W.2d 470, 472 (1977)).

their importance to a reliable prediction of future sexual violence.

. . . Here, it was Keith who repeatedly alerted the jury to the lack of personal interactions between him and Miller. The State merely responded. Therefore, based on the tack Keith chose for trial, we conclude that Keith opened the door for the State to comment on his refusal to meet with or be tested by Miller and that the State's response was appropriate under the circumstances of this case.

*Id.* at 81–83, 573 N.W.2d at 897–98.

Subsequent to *Keith*, in *Kienitz*, this court again examined a situation, also involving Dr. Sindberg as one of the psychologists assigned to evaluate a ch. 980, STATS., defendant, similar to that of the instant case. In *Kienitz*, Dr. Sindberg also "testified that [the defendant] refused to be interviewed by him." *Kienitz*, 221 Wis. 2d at 313, 585 N.W.2d at 624. In *Kienitz*, however, the defendant failed to object and, as a result, we concluded "that [the defendant] waived objection to the testimony on his refusal to be interviewed by the State's experts." *Id.* In a footnote, however, we observed that "*Keith* supports our view that the use by Kienitz's trial counsel of the lack of an interview to challenge the quality of the expert opinion is inconsistent with the assertion of a Fifth Amendment violation." *Kienitz*, 221 Wis. 2d at 314 n.20, 585 N.W.2d at 625 n.20.[7]

---

[7] We also stated:

We are not persuaded on this record that we should consider Kienitz's challenge to the testimony in spite of waiver. The affirmative use by the defense of the lack of an interview with Kienitz, *combined with the absence of any comment by the prosecutor in closing*, as well as the context in which the challenged testimony occurred—identification and foundation—convince us that there are no compelling reasons to address this issue.

The material circumstances of the instant case are virtually identical to those of *Keith*. Thus, *Keith* controls and, accordingly, we conclude that Dr. Sindberg's testimony about Adams's refusal to be interviewed did not violate Adams's Fifth Amendment right to remain silent.

## VI. EVIDENTIARY RULINGS

Adams argues that he "was denied due process by trial court rulings which repeatedly denied him the ability to confront the witnesses against him, while at the same time the State was repeatedly allowed to ask blatantly leading questions." He lists fifteen examples of what he considers improper denials of defense questions, and nine examples of allowances of what he considers the prosecutor's leading questions. He fails, however, to offer any specific argument that the trial court erroneously exercised discretion in any of its rulings on any of these questions. Thus, he has failed to

---

*Kienitz*, 221 Wis. 2d at 314, 585 N.W.2d at 625 (emphasis added; footnote omitted).

We reiterate that the manner in which a prosecutor might refer to such testimony in closing argument could be critical. After all, if the prosecutor commented on a defendant's refusal to be interviewed as evidence of guilt, rather than as an explanation counterin g the defense theory that the psychologist had violated professional standards and rendered an unreliable opinion, then, under *State v. Zanelli*, 212 Wis. 2d 358, 569 N.W.2d 301 (Ct. App. 1997), the Fifth Amendment right to silence might be implicated. This possibility, however, is not presented in the instant case because, according to the record, "closing arguments of either counsel were not requested or transcribed."

81

establish that any trial court ruling denied him due process. *See Barakat v. DHSS*, 191 Wis. 2d 769, 786, 530 N.W.2d 392, 398 (Ct. App. 1995) (appellate court need not consider "amorphous and insufficiently developed" arguments).

## VII. DENIAL OF MOTION FOR MISTRIAL

Finally, Adams argues that "[t]he State exceeded the scope of the pre-trial ruling concerning an alleged sexual assault which was dismissed" and, further, that the resulting disclosure of inadmissible information to the jury was prejudicial, requiring the trial court to declare a mistrial.

In a motion *in limine*, Adams asked the trial court to prohibit the State's witnesses from referring to other crimes with which he had been charged and, specifically, to a 1992 incident resulting in a sexual assault charge that had been dismissed when the alleged victim failed to appear in court. The trial court ruled "that the information about the 1992 incident can be presented in this fashion[:] that Mr. Adams was arrested for sexual assault in which the complainant was an adult female victim. The case was issued and dismissed." Nevertheless, the prosecutor, on re-direct examination of Dr. Diamond, began a question by stating: "With respect to the 1992 incident, this is the one where he was on parole. There was an arrest for a sexual assault. The case was issued and then was dismissed, because the victim did not show—"

Defense counsel objected and moved for a mistrial, arguing that the reference to the reason for the dismissal "basically shifts the burden to the defense now to almost try the case to show . . . why she didn't show if, in fact, that is the case." The trial court denied the motion, concluding that the information was "not

unduly prejudicial . . . in light of the entirety of the record in this case about the 1992 matter that's already on the record." The trial court then offered to consider a curative instruction, but defense counsel declined to request one.

A trial court's decision to grant or deny a motion for mistrial is discretionary. *State v. Pankow*, 144 Wis. 2d 23, 47, 422 N.W.2d 913, 921 (Ct. App. 1988). In making its decision, a trial court must consider the entire proceeding and determine whether the claimed error is sufficiently prejudicial to warrant a new trial. *State v. Grady*, 93 Wis. 2d 1, 13, 286 N.W.2d 607, 612 (Ct. App. 1979). We will reverse a trial court's denial of a motion for mistrial only upon a "clear showing" that the trial court erroneously exercised discretion. *Pankow*, 144 Wis. 2d at 47, 422 N.W.2d at 921.

We have reviewed the entire proceeding and see nothing erroneous in the trial court's conclusion. As the State has argued:

> The focus of all the testimony about the 1992 incident was whether [Dr. Diamond] had erroneously viewed the incident as a conviction and whether [he] would hold the same opinion [about whether, as a result of his mental disorder, Adams was substantially probable to commit a sexually violent offense] if he did not consider the 1992 incident in forming his opinion. That issue was fully and fairly aired. The brief, passing reference to the fact that the case was dismissed because the victim didn't show up was not prejudicial. There is no reasonable possibility that the verdict in this case would have been different if that reference had not occurred.

83

We agree. Adams has offered nothing to explain how this reference resulted in prejudice requiring a mistrial.

*By the Court.*—Order affirmed.